**SIGNED THIS: September 2, 2020**

_____
**Mary P. Gorman**
**United States Bankruptcy Judge**
_____

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| In Re | ) | |
| | ) | Case No. 18-71012 |
| TRAVIS L. MURPHY, | ) | |
| | ) | Chapter 7 |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| UMB BANK, N.A., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. No. 18-07050 |
| | ) | |
| TRAVIS L. MURPHY, | ) | |
| | ) | |
| Defendant. | ) | |

## O P I N I O N

Before the Court is Plaintiff UMB Bank, N.A.'s Motion for Summary Judgment seeking judgment on its complaint to deny the Debtor's discharge or, alternatively, to except the debt owed to UMB Bank from the Debtor's discharge.

Because UMB Bank has established that there are no material facts in dispute and that it is entitled to judgment as a matter of law, the Debtor's discharge will be denied.

## I.   Factual and Procedural Background

### A. The Debtor's Bankruptcy Case

Travis Murphy ("Debtor") filed his Chapter 7 voluntary petition on July 12, 2018. He had been engaged in the business of farming with his parents, John and Carolyn Murphy, for a number of years and was a partner in Murphy Farms. He reported more than $11 million in liabilities in his bankruptcy filing, related almost entirely to the farming operation. He also reported more than $5 million in assets, also related to the farming operation. Among several other tracts of land, on his Schedule A/B: Property, the Debtor listed a "Grain Complex" on three acres that he valued at $2,650,000 based on a 2016 appraisal. On his Schedule D: Creditors Who Have Claims Secured by Property, the Debtor stated that he owed UMB Bank more than $8.3 million, secured by approximately $5.75 million in property, including the Grain Complex.

According to his Statement of Financial Affairs ("SOFA"), the Debtor gave UMB Bank a financial statement regarding the farming business in March 2017. On his SOFA, the Debtor also listed a pending lawsuit against him, commenced by UMB Bank in the Cass County Circuit Court (18-CH-5), and noted that a receiver had been appointed in that case. The Debtor disclosed a transfer to the "Murphy Family Trust" on April 25, 2018, of "Grain facility real estate (fully

encumbered); Residence in Vincennes, Illinois." The Debtor also listed an ownership interest worth "$0.00" in "the Murphy Family Trust dated April 25, 2018 – FMV $20,000.00." On his Schedule H: Your Codebtors, the Debtor identified his father as also being liable for several of the debts listed by the Debtor, including much of the debt owed to UMB Bank.[1]

Andrew Erickson was appointed Chapter 7 trustee ("Trustee") in the Debtor's case and conducted an initial creditors meeting on August 27, 2018. A continued meeting was held in September. Thereafter, the Trustee filed a Motion for Turnover Order seeking to compel the Debtor to turn over to him a 2015 Chevrolet Tahoe, a 1999 Freightliner FL 70, a 2011 HL80 Trailer, the Debtor's right to receive non-exempt state and federal tax refunds, the Debtor's right to receive any Agriculture Risk Coverage payments from the United States government, the Debtor's right to receive any Price Loss Coverage payments from the United States government, the Debtor's right to receive any payment through his potential interest in Syngenta class action litigation and settlement, and all records relating to the prepetition disposition of a 2004 GMC C8500 that the Debtor testified at his creditors meeting as having been traded to a creditor in satisfaction of a debt ("First Motion for Turnover"). The Debtor objected to the

---

[1] John and Carolyn Murphy filed for Chapter 11 relief the day before the Debtor filed his Chapter 7 case. Their filing was assigned case no. 18-71007 and consisted largely of the same debts and assets as the Debtor. Mr. and Mrs. Murphy are also defendants in the Cass County litigation. In their Chapter 11 case, UMB Bank successfully obtained stay relief, defeated the Murphys' attempt to regain possession of assets from the state court receiver, and commenced a proceeding to deny the Murphys their discharge. The Murphys, however, obtained an order dismissing their Chapter 11 case before the discharge proceeding was resolved on the merits. The order dismissing case included a one-year bar to refiling. On August 17, 2020, while the present matter was pending, John Murphy filed a voluntary petition under Chapter 12 of the Bankruptcy Code. That case was dismissed on August 25, 2020, due to John Murphy not having received prepetition credit counseling.

First Motion for Turnover, denying the existence of some of the property or, alternatively, disputing the valuations of the property or the amount of equity therein as asserted by the Trustee. Essentially, the Debtor argued that the liquidation value of the assets was not sufficient to justify compelling turnover.

Before the First Motion for Turnover could be heard, the Debtor, through his attorney at the time, filed a motion to dismiss case contending that settlement of his debts could be better achieved outside of bankruptcy. Less than a week later, before that motion could be heard, the Debtor's attorney filed a motion to withdraw asserting that he had been terminated by the Debtor. The motion to withdraw was granted.

The Trustee objected to the Debtor's Motion to Dismiss, noting that, prior to filing, UMB Bank had a receiver appointed to preserve its rights in its collateral and that, immediately prior to the receiver's appointment, the Debtor established a self-settled trust known as the Murphy Family Trust into which he transferred several pieces of property. The Debtor filed a pro se response to the Trustee's objection to the Motion to Dismiss, arguing that the creation of and transfer of assets to the Murphy Family Trust had been blown out of proportion and taken out of context as it was all a mistake on the part of a title company that resulted in the wrong properties being transferred to the trust. He further accused the Trustee of mischaracterizing the facts and of objecting to the Motion to Dismiss for his own financial gain.

A hearing on the Trustee's First Motion for Turnover and the Debtor's Motion to Dismiss was held on January 8, 2019. The Debtor appeared without counsel

and, at his request, both motions were continued to January 29 so that he could arrange for legal representation. The Court noted that it expected that the motions would be heard at that time and that it would not be inclined to grant another request for continuance based on the Debtor not having or only recently having retained counsel.

The day before the continued hearing on the Motion for Turnover and Motion to Dismiss, the Debtor filed a second motion to continue hearing stating that, although he had retained counsel, the attorney had prior commitments and the Debtor himself had fallen ill with the flu. The motion was granted, and the matters were reset for hearing on February 12, 2019. The day before that scheduled hearing, the Debtor, through newly-retained counsel, filed another motion to continue, this time stating that his attorney was scheduled to participate in a deposition on the February 12 hearing date. The motion was granted, and the hearing was reset for a telephonic conference call two days later.

The February 14 telephonic hearing was held as scheduled. Attorney Byron Sims appeared on the Debtor's behalf. After brief argument, the Debtor's Motion to Dismiss was denied. As to the First Motion for Turnover, Mr. Sims acknowledged the existence of the 2015 Chevrolet Tahoe, 1999 Freightliner FL 70, and 2011 HL80 Trailer, but he noted that the remaining assets identified in the motion were "not currently in the Debtor's possession" and that whatever interest he might have in the potential payments or lawsuit proceeds was not known. The Court granted the motion, ordering the Debtor to immediately turn

over the 2015 Tahoe, the 1999 Freightliner, and the 2011 Trailer, and to turn over the remaining assets if and when they were received.

The following day, Attorney Sims filed a Motion to Withdraw as Attorney, stating that the Debtor wished to terminate him as his attorney. The Motion to Withdraw was set for hearing on February 26, 2019. Also set for hearing that day was a motion for stay relief filed by UMB Bank seeking relief from stay to continue the Cass County foreclosure proceedings related to the Debtor's real estate and personal property. On February 25, the Debtor, acting pro se, filed a motion to continue the February 26 hearing, stating that "replacement counsel has been lined up" but would not be able to appear in the case prior to the scheduled hearing. He asked for a fifteen-day continuance to allow his new counsel to familiarize himself with the case. The motion to continue was summarily denied. In the order denying, the Court noted that the Debtor had already been granted several continuances to obtain legal counsel. The February 26 hearing was held as scheduled. Mr. Sims appeared and his Motion to Withdraw was granted. The Debtor did not appear. UMB Bank's motion for stay relief was also granted.

On September 20, 2019, the Trustee filed his Motion to Compel. In it, the Trustee stated that, despite the prior order granting his First Motion for Turnover and directing the Debtor to turn over a 2015 Chevrolet Tahoe, a 1999 Freightliner, and a 2011 Trailer months earlier, the Debtor had failed to do so. The Trustee explained that, after the Debtor failed to turn over the property, he engaged with Debtor's latest counsel, William McCleery, to negotiate a resolution

of the matter but that those talks stalled and that the Debtor had been unresponsive. Through the Motion to Compel, the Trustee sought an order compelling the Debtor's compliance with the turnover order entered February 20, 2019. The Motion to Compel was set for hearing on October 22, 2019.

Prior to the hearing, the Debtor, through counsel, filed a response to the Motion to Compel arguing for the first time that the Debtor did not have possession or title to the 1999 Freightliner or the 2011 Trailer because he had transferred the titles to his father in 2015 and 2013, respectively. The response also attempted to justify the failure to turn over the 2015 Chevrolet Tahoe by arguing that there was no equity in it for the Trustee to make any distribution to creditors.

The October 22 hearing was held as scheduled. According to the Trustee, he was considering an offer from the Debtor to pay the Trustee the equity value in lieu of turnover and liquidation. As to the 1999 Freightliner and the 2011 Trailer, despite the Debtor's response that asserted the property had been transferred to the Debtor's father prior to bankruptcy, the Trustee maintained that the items were property of the bankruptcy estate. He noted that the Debtor listed them as his assets on his petition and that he registered the items in his own name until well after the date of the purported transfers. At the Trustee's request, the matter was set for evidentiary hearing on November 19, 2019.

At the November setting, the parties announced that they had come to a resolution of the Trustee's Motion to Compel. As part of that agreement, the Debtor agreed to pay the Trustee $3500 for his interest in the assets. The Court

expressed concern about the Debtor's failure to comply with prior orders but directed the parties to submit an agreed order on the matter. The agreed order, signed and submitted by the parties and entered by the Court on November 27, 2019, required the Debtor to pay the Trustee $3500 within 90 days, in full satisfaction of the estate's interest in the 2015 Chevrolet Tahoe, the 1999 Freightliner, and the 2011 Trailer.

On January 29, 2020, the Debtor filed a Motion to Convert Case from Chapter 7 to Chapter 11. The matter was set for hearing on February 25, 2020. UMB Bank and Farm Credit Services of America filed objections to the Motion to Convert. Prior to the hearing, the Debtor also signed and filed a Waiver of Discharge, which was set for the same hearing date. A few days before the February setting, the Debtor filed a motion to continue hearing to allow him additional time to review and respond to the objections to his Motion to Convert. The motion to continue was set for hearing with the Motion to Convert and Waiver of Discharge.

The February 25 hearing was held as scheduled, but the Debtor did not personally appear. The Court noted that the Debtor's personal appearance was necessary for it to consider approving the Waiver of Discharge and that it would need to be reset. Taking up the Motion to Convert, the United States Trustee and Trustee voiced their agreement with the banks' objections. The Trustee added that the Debtor was under an agreed order to turn over money that very day and that he had not received those funds. The Debtor's attorney responded that the day was not over. He said that the objections filed by UMB Bank and Farm Credit

Services of America were extensive and that he needed time to respond in writing. The Court noted that it would have to take testimony on the matters and that the Debtor would need to be present and testify. The Court also noted that, if the Debtor were to convert, the stay, relief from which had been granted a year prior, would not automatically be reinstated. The Court also pointed out that it had entered an order more than a year prior excusing the state court receiver from having to turn over property to the Trustee and that conversion would not likely change that order. Ultimately, the Debtor requested and was granted time to file a more detailed motion to convert addressing, among other things, the Debtor's good faith and whether there was a reasonable likelihood of a successful reorganization. The case was set for hearing on March 24, 2020, on the Waiver of Discharge, as well as a status on the anticipated amended motion to convert. In the meantime, the Trustee filed a Motion for Contempt based on the Debtor's failure to comply with the November 2019 agreed order settling the Trustee's motion to compel turnover. The matter was also set for hearing on March 24.

On March 13, 2020, the District Court entered a general order restricting the operations of all courts in the Central District of Illinois in response to the COVID-19 pandemic. As a result, in person hearings were restricted, and the March 24 hearing on the Motion to Convert and Waiver of Discharge, at which the Debtor was expected to be personally present and testify, was cancelled and reset for May 19, 2020. The Debtor then filed a Motion to Withdraw his motion to convert, which was allowed.

On March 24, a telephonic hearing on the Motion for Contempt was held. The Debtor's attorney acknowledged that the Debtor had not complied with the agreed order settling the turnover motion and that he did not have funds to do so. He said, however, that the Debtor wanted to retain the Chevrolet Tahoe and renegotiate a payment to the Trustee to keep that vehicle. The Debtor offered nothing for the other items he had been ordered to turn over and had agreed to pay for; his attorney suggested that a hearing would be needed to determine whether the Debtor had an interest in those assets. Both the Trustee and the Court expressed concern that the Debtor had not previously asked the Court to reconsider or vacate its order from February 2019 granting turnover and that, to avoid litigating the issues, the Debtor had entered into an agreed order to pay the Trustee the value of all of the assets. The Court questioned how the Debtor could just decide that he no longer wanted to comply with the agreed order after receiving the benefit of keeping and using the assets for more than a year. The Court granted the Motion for Contempt and entered a money judgment in the amount of $3500 against the Debtor. The Court also reset the Motion for Contempt for telephonic hearing on April 21, 2020, admonishing the Debtor's attorney that, if the judgment was not paid by then, fees for the Trustee and a daily monetary sanction would be imposed until the judgment was paid.

Shortly before the hearing on the Motion for Contempt, the Debtor filed a Motion to Dismiss the case. He asserted that both UMB Bank and Farm Credit Services had accused him of bad faith and, because bad faith was grounds for dismissal, his case should be dismissed. He proposed that the Trustee disburse

the funds on hand 95% to UMB Bank and 5% to Farm Credit Services. Although the Motion to Dismiss was not set for the March 24 hearing, having just been filed that day, the Court, at the hearing, did raise with the Debtor's attorney the lack of authority to dismiss a case and have the Trustee distribute funds to only two of the creditors as requested by the Debtor. The Trustee also said that he would object to the Motion to Dismiss for numerous reasons. The Debtor's attorney said that the dismissal was being sought to resolve the remaining issues in the case "expeditiously." The Court reminded the Debtor's attorney that, until the issues regarding the Debtor's payment of the $3500 judgment owed to the Trustee were resolved, the case could not be dismissed or closed. The Motion to Dismiss was ultimately stricken due to the failure to file a certificate of service. The request for dismissal was never renewed.

At the April 21 hearing, the Trustee reported that the Debtor had paid the money judgment in full, and he withdrew his Motion for Contempt. On May 15, 2020, the Debtor withdrew his Waiver of Discharge. The Trustee continues to administer assets and the case remains open.

## B. The Adversary Proceeding

On October 26, 2018, UMB Bank commenced this adversary proceeding by filing its complaint objecting to entry of a discharge and, alternatively, to the dischargeability of the debt owed to it by the Debtor. The six-count complaint generally alleges wrongdoing by the Debtor in obtaining an extension and

subsequent renewal of several loans made by UMB Bank to the Debtor and his parents for their farming operations.

On March 12, 2019, more than four months after the complaint had been filed and the Debtor had been served with summons, UMB Bank filed a Motion for Default Judgment based on the Debtor's failure to answer the complaint. The Motion for Default Judgment was set for hearing on March 26, 2019. Prior to the hearing, the Debtor, through newly-retained counsel, William McCleery, filed his answer to the complaint. The hearing on the Motion for Default Judgment, however, remained set.

The March 26 hearing was held as scheduled. Neither the Debtor nor his attorney appeared. Counsel for UMB Bank informed the Court that he had received email correspondence from the Debtor's attorney saying that he was out of town and would not be attending the hearing. After expressing surprise that Attorney McCleery would just not show up for the hearing on the Motion for Default Judgment, the Court directed the Clerk to enter a default under Federal Rule of Civil Procedure 55(a) and reset UMB Bank's Motion for Default Judgment for hearing on April 9, 2019.

The Debtor filed a Motion to Vacate the entry of default on April 5.[2] In it, the Debtor argued that his attorney's failure to appear was a result of his mistaken belief that the filing of the answer made UMB Bank's motion moot and that the proceeding should be allowed to move forward to a resolution on the merits. The Motion to Vacate was set with UMB Bank's Motion for Default Judgment for April

---

[2] The motion mistakenly sought to vacate a default judgment, which had not been entered.

9, 2019. The hearing was held as scheduled; counsel for both parties appeared. In vacating the entry of default, the Court noted that it had already given the Debtor multiple extensions of time and that neither the Debtor nor his attorney should expect further extensions going forward. The Court then set the matter for a pretrial conference on June 27, 2019. The Court emphasized that it planned to move the case along, that it would be entering its pretrial order, and that the parties were to get together on a plan for discovery and preparing for trial ahead of the June 27 pretrial conference.

On June 24, UMB Bank filed a motion to continue the pretrial conference with the Debtor's consent. The motion stated that the parties had been negotiating several issues and believed they could come to a full resolution of the proceeding that would be satisfactory to the Court and creditors. The motion was allowed, and the pretrial conference was reset for July 18.

Prior to the July pretrial conference, UMB Bank filed a pretrial statement without any apparent participation from the Debtor or his attorney. In it, UMB Bank explained that it had conducted certain discovery and provided its Rule 26(a) disclosures to the Debtor but had not received reciprocal disclosures from the Debtor. UMB Bank also stated that it had made several attempts to schedule the Debtor's deposition in coordination with the Debtor's attorney without success but still planned to proceed with scheduling depositions with the Debtor's input. UMB Bank also noted that it had served other written discovery on the Debtor, to which it had not received responses, but that it had more

discovery to conduct and anticipated having all discovery completed within 120 days.

The July 18 pretrial conference was held as scheduled. The Debtor's attorney acknowledged that he did not file or participate in the filing of a pretrial statement notwithstanding the Court's pretrial order requiring him to do so. He also acknowledged that he had not provided UMB Bank with the disclosures required under Federal Rule of Civil Procedure 26(a). Attorney McCleery said that he thought the matters were going to be resolved prior to the hearing and that, in any event, his time was better spent on matters he saw as more pressing than the Court's pretrial order. The Court explained that the only way to settle an adversary proceeding objecting to discharge was to agree to entry of an order denying the Debtor's discharge or for the Debtor to waive discharge and that, if such a settlement were going to be proposed, it needed to happen quickly because the proceeding was otherwise moving forward. The Court entered an order requiring the Debtor's pretrial statement to be filed and the Rule 26(a) disclosures to be provided to UMB Bank within fourteen days. The pretrial conference was reset for August 8, 2019.

A week before the continued pretrial conference, the Debtor filed his pretrial statement stating that he did not intend to conduct any discovery but certifying that he had provided UMB Bank with the required Rule 26(a) disclosures the same date. The August 8 pretrial conference was held as scheduled. The parties informed the Court that settlement had not been reached. The Court asked whether 120 days was still sufficient for UMB Bank to complete

its discovery; UMB Bank was reluctant to commit to that deadline. Apparently, the examination of the Debtor's father, which was scheduled to occur just a few days prior did not happen due to his failing health. Counsel for UMB Bank said that there was no indication of when or whether the witness would be available for examination in the future and noted that he continued to be unsuccessful in getting other depositions scheduled. Based on this information, the Court declined to set a final discovery cutoff and instead set the matter for further status on November 21, 2019. The Court did note, however, its expectation that discovery be substantially complete by that date.

In late September, UMB Bank filed correspondence giving notice of subpoenas for documents being issued to third parties and the scheduling of depositions of the Debtor and his parents to be held at the end of October. A week later, UMB Bank filed a Motion to Compel Response to Plaintiff's First Request for Production of Documents ("First Motion to Compel"), stating that it still had not received any response to the written discovery served on the Debtor on June 5, 2019, despite several attempts to confer with counsel and resolve the matter without court intervention. The First Motion to Compel was set for hearing on October 22, 2019. The hearing was held as scheduled. UMB Bank explained that it did not wish to subject the Debtor to unnecessary production costs and that, if the Debtor believed that UMB Bank was already in possession of documents that were the subject of the production request, then he should indicate as much in response. UMB Bank asked that the Debtor be ordered to appropriately respond to the production requests within fourteen days. The Debtor did not

object, and the Court entered an order granting the motion and compelling the Debtor to respond within fourteen days.

On November 14, 2019, UMB Bank filed another Motion to Compel and for Sanctions ("Second Motion to Compel"). The Second Motion to Compel detailed the lengthy and troubling history of the case, including the delays in the Debtor answering the complaint, his nonparticipation in the pretrial statement, and his continued failure to respond or participate in the discovery process. Despite an order compelling the Debtor's response to written discovery issued in June, the Debtor still had not provided any response or produced any of the documents that were requested. In addition, the motion noted that, to date, the Debtor had failed to provide available dates to be deposed. As a sanction for the Debtor's failure to cooperate with discovery requests, UMB Bank asked the Court to order compliance with production requests within three days, to order payment of UMB Bank's attorney's fees incurred in compelling cooperation, and to enter a default judgment against the Debtor or bar him from offering evidence in opposition to the allegations of the complaint. The matter was set for telephonic hearing on November 21, 2019.

At the November 21 hearing, counsel for UMB Bank recited the background that served as the basis for its Second Motion to Compel, adding that, just that morning, the Debtor's attorney sent him an email with the Debtor's purported discovery responses attached. He said that the response was comprised of three documents and blanket assertions that the bank already had the other documents requested without identifying what those documents were. UMB

Bank's attorney said that there was no explanation as to whether the Debtor in fact had the documents sought and no specificity as to the basis for stating that the documents were already in the bank's possession or which ones were actually in the bank's possession. UMB Bank also stressed the continued inability to schedule depositions of the Debtor and his parents. The Debtor's attorney expressed his understanding that the situation was problematic but offered that his ability to address the issue had been hindered by the Debtor's lack of responsiveness to him. He said that the Debtor was reluctant to appear and had refused to provide dates when he would be available for his deposition.

The Court granted the Second Motion to Compel, directing the Debtor to supplement his response to the document production requests by the middle of the following week and instructing UMB Bank's attorney to notice the depositions at a date and time convenient for him and his client. The Court stated that if the Debtor continued to refuse to cooperate with discovery, his ability to present evidence or otherwise participate in a trial of the case might be severely limited. Recognizing that the Debtor most likely expected to have his day in court on the issue of his discharge, the Court noted that, to be entitled to such a day in court, the Debtor had to comply with discovery. Finally, the Court stated that it was reserving ruling on the issue of attorney's fees, noting that there would be some fees awarded based on the failure of the Debtor to timely comply with the order granting the First Motion to Compel.

On February 2, 2020, UMB Bank filed another Motion for Sanctions. In it, UMB Bank again recited the troubled history of the case, including the fact that

the Order granting the Second Motion to Compel, entered November 22, 2019,
set a deadline of November 27, 2019, for the Debtor to supplement and fully
respond to the production requests served in June 2019. As of the date of the
new Motion for Sanctions, the Debtor had still not fully responded. In addition,
UMB Bank alleged that, in recent days, the Debtor had expressed ambivalence
toward reaching a settlement to resolve the adversary, which UMB Bank asserted
made his failure to respond to discovery inexplicable. The matter was set for
hearing on February 25, 2020.

At the February 25 hearing, UMB Bank asked the Court to enter judgement
in its favor or for such lesser sanction as it deemed appropriate, emphasizing
that there had been no further response to any of the discovery requests since
the last hearing and resulting order on the issue. In response, the Debtor's
attorney said that the parties had been continuing to negotiate settlement until
it recently fell through and suggested that the Debtor's Waiver of Discharge
pending in the main bankruptcy case ought to take care of everything because
it would achieve the same result sought by UMB Bank in the adversary. UMB
Bank agreed that a waiver of discharge would, in large measure, achieve the
same general result as an order denying the Debtor's discharge, with the
important difference that an entry of judgment in its favor on the complaint
would come with certain findings as to wrongdoing on the part of the Debtor that
might have significance in other proceedings. The Court agreed and granted the
Motion for Sanctions, in part, and directed UMB Bank to submit an order giving

time for its attorney to file an affidavit as to fees incurred as a result of chasing down discovery responses and prosecuting its motions to compel.

The Court continued the issue as to whether it would grant judgment in favor of UMB Bank as a sanction to the March 24 hearing date when the Debtor's Waiver of Discharge was set. The Court explained that, if the Debtor were to waive his discharge, no further sanctions would be imposed. But, if the Debtor were to not proceed with his Waiver of Discharge, the Court would bar the Debtor from presenting any evidence in his defense, including cross-examination of UMB Bank's witnesses, at any trial on the complaint.

At the March 24 hearing, the Court discussed with UMB Bank's attorney the fact that he had submitted an unitemized request for fees and directed that a fully itemized statement be submitted if he wanted a fee award. At a hearing on April 21, 2020, the Court stated that it would be entering an order awarding attorney's fees to UMB Bank based on the itemized affidavit submitted to the Court to which the Debtor had not objected after being given time to do so. The Court then directed UMB Bank's attorney to submit an order precluding the Debtor from offering evidence in his defense as an additional sanction for his failure to participate in discovery and to proceed with a motion for summary judgment. The Court explained that it was not going to outright deny the Debtor's discharge as a sanction and that UMB Bank still needed to prove-up its entitlement to relief; the best way to accomplish that being to file a motion with evidentiary support unless the Debtor's pending Waiver of Discharge were to be granted in the meantime.

With the ongoing hiatus of in-person hearings due to the COVID-19 pandemic, the hearing on the Debtor's Waiver of Discharge was continued several times, and the Waiver of Discharge was withdrawn by the Debtor on May 15, 2020. UMB Bank then filed its Motion for Summary Judgment on June 5, 2020.

The Motion for Summary Judgment relied on an affidavit of Christopher Rennau, the Vice President and Senior Portfolio Manager of the Agribusiness Division of UMB Bank.[3] According to the Affidavit, Mr. Rennau, in his capacity as Vice President and Senior Portfolio Manager, had primary responsibility for the administration of all loans made by UMB Bank to the Debtor and his parents since September 25, 2017. He further stated that he had reviewed and was readily familiar with the documents and records maintained by UMB Bank in the ordinary course of business concerning all loans made to the Debtor and his parents. Mr. Rennau stated that he also personally corresponded with the Debtor and his parents, visited them at their home and farm on behalf of UMB Bank, and was readily familiar with all aspects of the administration of the loans made, collection activities, and discussions, negotiations, and communications with the Debtor and his parents. The Motion for Summary Judgment also included several documents as exhibits.

---

[3] The affidavit of Mr. Rennau originally included with the Motion for Summary Judgment did not explain who he was or his relationship to UMB Bank or the Debtor. At the Court's direction, UMB Bank supplemented the original affidavit with a second one that laid a foundation for his knowledge in this matter and incorporated the contents of the original affidavit. To the extent the Court refers to the Affidavit in this Opinion, it does so as to both affidavits collectively.

According to the Affidavit and uncontested facts set forth in the Motion for Summary Judgment, beginning in October 2016, UMB Bank made several loans ("October Loans") to the Debtor and his parents who were engaged in farming real property that they owned or rented.[4] In 2017, UMB Bank extended two more loans to the Debtor and his parents ("Additional Loans").[5] The loans are secured by approximately 440.61 acres of real property located in Cass County, Illinois, including land containing the Grain Complex. The loans were further secured by personal property of the Debtor and his parents, including all of their equipment, crops, and farm products. The loan documents provided for cross-collateralization; when one of the loans became due but was not paid, that default constituted a default under all of the loans.

Prior to obtaining loans from UMB Bank, the Debtor apparently commissioned the construction and erection of the Grain Complex, complete with grain handling and conveying equipment, storage bins, a "wet" hopper tank, double-run grain pump, continuous-flow dryer, dry elevator leg, and supporting frame, stairway catwalk and related concrete and electrical appurtenances relating thereto. In September 2014, Valley View Agri-Systems ("Valley View") provided the Debtor with a bid in the amount of $986,837 to complete the project ("True Bid").

As part of the loan application and approval process for loans to the Debtor, UMB Bank claims it relied on one or more appraisals for the Grain Complex by

---

[4] The October Loans consisted of five loans, each dated October 14, 2016, in the aggregate amount of $4,053,000.
[5] The Additional Loans were extended on March 15, 2017, and July 26, 2017, in the aggregate amount of $4,365,000.

Briggs Appraisal Associates. Included in the appraisal documents was a bid for the construction of the Grain Complex from Valley View in the amount of $2,639,500. According to the deposition testimony of Paul Reither, who conducted the appraisal on behalf of Brigg's Appraisal Associates, the Grain Complex was appraised using a cost approach, which was driven by the fact that the facility had recently been constructed. He stated that he therefore used the bid provided to him by the Debtor and his parents in the amount of $2,639,500 as a benchmark for the appraisals. The appraiser testified that, if he had been provided the actual costs, his appraisal of the Grain Complex would have been around $1 milion dollars rather than $2.65 million.

At the meeting of creditors, the Debtor admitted that the bid for $2,639,500 was inflated ("Inflated Bid"). Further, according to the affidavit of Jim Cochran, apparently associated with Valley View, the Inflated Bid was not prepared by Valley View and was not provided by Valley View to the Debtor or his parents.[6] Mr. Cochran says that the True Bid of $986,837 actually made by Valley View was provided to the Debtor and his parents in WORD format.

On December 30, 2015, the Debtor and his father executed a balance sheet ("2015 Balance Sheet"), which they also provided to UMB Bank prior to obtaining approval for the original October Loans. The 2015 Balance Sheet valued the Grain Complex at $2,650,000. On December 30, 2016, the Debtor and his father again executed a balance sheet ("2016 Balance Sheet") valuing the Grain

---

[6] The affidavit did not set forth or state Mr. Cochran's connection to Valley View. It merely states that it is based on Mr. Cochran's personal knowledge and review of the books and records of Valley View maintained in the ordinary course.

Complex at $2,650,000. The 2016 Balance Sheet was provided to UMB Bank in connection with the funding of the Additional Loans.

The Debtor was also required to provide UMB Bank with copies of his 2014 Tax Returns prior to closing on the October Loans. According to Mr. Rennau, the tax returns that were provided to UMB Bank were materially different from the returns actually filed with the Internal Revenue Service ("IRS"). In the tax returns provided to UMB Bank ("False 2014 Tax Return"), the Debtor represented that he had $234,103 in gross income for 2014. The False 2014 Tax Return was signed by the Debtor and dated September 3, 2015. The actual returns filed with the IRS ("Actual 2014 Tax Return"), however, reflected gross income of only $40,185 for 2014. The Actual 2014 Tax Return bears an official seal indicating that it is an authentic reproduction of the return filed with the IRS. UMB Bank says that the Actual 2014 Tax Return was not submitted to UMB Bank when the Debtor sought the loans; UMB Bank obtained a copy of the Actual 2014 Tax Return through the state court receivership proceedings.

After extending the loans to the Debtor and his parents, UMB Bank conducted a grain inspection at the Debtor and his parents' farm in Chandlerville, Illinois, on October 13, 2017, but was unable to verify the existence of all of the grain pledged as collateral for its loans. UMB Bank says that the Debtor would not permit it access to the grain bins to inspect the contents, citing insurance reasons. Instead, the Debtor signed a grain statement stating that he had 440,000 bushels of corn stored in various locations with a total value of $1,452,000. These representations notwithstanding, UMB Bank claims that, less

than a week later, the Debtor admitted that he and his parents had sold approximately 62,000 bushels of stored corn to finance their harvest expenses. UMB Bank personnel then met with the Debtor and his father, who both represented that there were in fact only 285,000 bushels of corn stored. On October 31, 2017, UMB Bank personnel performed another collateral inspection at the farm and could only verify the existence of approximately 224,250 bushels of corn—barely half of the 440,000 bushels initially represented to exist.

On February 12, 2018, an attorney representing the Debtor and his parents sent an email to UMB Bank's counsel stating that his clients had completed their 2017 harvest and had approximately one million bushels of corn in storage at that time. At the request of UMB Bank, the Debtor and his father represented in a signed letter, dated March 29, 2018 ("March 29 Letter"), that "no grain or livestock comprising security for the UMB Bank has been sold since the date of UMB's last inspection, including the 2017 harvest." The last collateral inspection by UMB Bank had occurred on October 31, 2017. UMB Bank later discovered that those representations were not true.

Under their security agreement with UMB Bank, the Debtor and his parents agreed that they would notify UMB Bank of the entities to which they intended to sell grain and that the proceeds from such sales would be made immediately available to UMB Bank in a form payable to both the Murphys and UMB Bank. The Debtor and his parents informed UMB Bank that they would be selling their grain to Archer Daniels Midland ("ADM") and several other entities. On October 26, 2017, UMB Bank sent notices of its security interests to Cargill, ADM, and

Consolidated Grain and Barge. According to UMB Bank, after doing so, two joint checks from ADM payable to the Debtor's father and UMB Bank, dated November 2 and 6, 2017, and totaling $23,476.98, were issued and applied to the debt owed to UMB Bank. Thereafter, between November 13, 2017, and May 19, 2018, the Debtor and his parents sold their grain to another company, Bunge, without notifying UMB Bank and deposited approximately $430,427.08 received from Bunge into a separate account held in the Debtor's parents' names at Petefish and Skiles Bank without making the proceeds available to UMB Bank.[7]

On April 3, 2018, UMB Bank filed suit against the Debtor and his parents in the circuit court of Cass County, Illinois, to recover on the debt and its collateral. UMB Bank also sought the appointment of a receiver. In early May, the parties entered into a settlement agreement whereby the Debtor and his parents represented that they had 540,000 bushels of corn in storage and agreed to the appointment of a receiver if they defaulted under the agreement. The Debtor and his parents failed to perform under the settlement agreement, and UMB Bank filed an emergency motion for the appointment of a receiver. On May 15, 2018, the state court set the emergency motion for hearing three days later. The same day, the Debtor and his parents executed a quitclaim deed transferring the Grain Complex and other property to the Murphy Family Trust without UMB Bank's knowledge or consent. The Debtor executed the deed both as grantor and as trustee for the grantee.

---

[7] The bank records attached to the Motion for Summary Judgment show nearly 40 deposits from Bunge over the course of several months, each ranging from a few thousand to tens of thousands of dollars.

On May 18, 2018, the state court appointed a receiver over the property of the Murphys, including the property securing the UMB Bank loans. And, on May 24, 2018, the Grain Complex deed was recorded. The receiver ultimately recovered 439,940.40 bushels of grain, which was more than 100,000 bushels less than the Murphys had represented were in existence to UMB Bank as part of the state court settlement agreement.

Count I of UMB Bank's complaint seeks a determination that the debt owed to it is nondischargeable under §523(a)(2)(A) because it was obtained through false pretenses, false representations of material facts that the Debtor knew to be false when he made them, and/or actual fraud, including but not limited to his misrepresentations as to the nature, value, and amount of grain held. Count II seeks a determination that the debt owed to it is nondischargeable under §523(a)(2)(B) because the Debtor intentionally made materially false statements in writing with respect to his financial condition—including his provision of false and inaccurate tax return information, financial statements, and the Inflated Bid—upon which UMB Bank reasonably relied. Count III contends that the debt owed to it is nondischargeable under §523(a)(6) because the Debtor actively concealed grain sales and intentionally kept the proceeds from UMB Bank, constituting willful and malicious injury to UMB Bank.

Counts IV, V, and VI object to entry of the Debtor's discharge under §727. Count IV alleges that the Debtor, with the intent to defraud, hinder, and delay UMB Bank, transferred, removed, or concealed grain, grain proceeds, and real property that was subject to UMB Bank's lien within one year before the petition

date contrary to §727(a)(2)(A). Count V objects to the Debtor's discharge under §727(a)(3) based on the Debtor's use of materially false statements in writing respecting his financial condition, including providing false and inaccurate tax returns and financial statements to UMB Bank. Finally, Count VI alleges that the Debtor knowingly and fraudulently, and in connection with his bankruptcy case, made false oaths or accounts contrary to §727(a)(4) in knowingly listing an inflated value for the Grain Complex.

UMB Bank asks the Court to enter summary judgment on Counts I, II, IV, V, and VI.

## II.    Jurisdiction

This Court has jurisdiction over the issues before it pursuant to 28 U.S.C. §1334. All bankruptcy cases and proceedings filed in the Central District of Illinois have been referred to the bankruptcy judges. CDIL-Bankr. LR 4.1; *see* 28 U.S.C. §157(a). Objections to discharge and the determination of the dischargeability of a particular debt are core proceedings. 28 U.S.C. §157(b)(2)(I), (J). These matters arise from the Debtor's bankruptcy itself and from the provisions of the Bankruptcy Code and may therefore be constitutionally decided by a bankruptcy judge. *See Stern v. Marshall*, 564 U.S. 462, 499 (2011).

### III.   Legal Analysis

#### A.   Summary Judgment Standard

Motions for summary judgment are governed by Federal Rule of Civil Procedure 56, which is applicable in this adversary proceeding pursuant to Federal Rule of Bankruptcy Procedure 7056. *See* Fed. R. Civ. P. 56; Fed R. Bankr. P. 7056. Summary judgment is an encouraged method for resolving cases and should be granted when there are no genuine disputes as to any material facts and a party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 327 (1986). A party moving for summary judgment has the burden of establishing that there are no material facts in dispute. *Id.* The movant must also establish that controlling substantive law supports a result in its favor. *See ANR Advance Transp. Co. v. Int'l Brotherhood of Teamsters, Local 710*, 153 F.3d 774, 777 (7th Cir. 1998).

Here, there is no dispute as to the material facts. The Debtor was barred from offering evidence as a sanction for his conduct in this adversary proceeding, namely his failure to cooperate in the discovery process in any meaningful way.[8] Thus, the Debtor was unable to raise any factual disputes. The only thing for the

---

[8] Federal Rule of Civil Procedure 37, applicable in this proceeding through Federal Rule of Bankruptcy Procedure 7037, provides for a variety of sanctions to remediate failures to make disclosures or to cooperate in discovery, including "rendering default judgment against the disobedient party[.]" Fed. R. Civ. P. 37(b)(2)(A)(vi); Fed. R. Bankr. P. 7037. While default judgment is generally considered a harsh sanction, it is appropriate when noncompliance is due to a party's "willfulness, bad faith, or any fault of the [disobedient party]" rather than simply being unable to comply with a discovery order. *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 640 (1976) (citations omitted). Here, the Debtor repeatedly disregarded the mandates of the Federal Rules of Civil Procedure as well as this Court's specific orders regarding discovery. The failures were inexplicable and occurred over the life of the proceeding despite numerous reminders, admonishments, and orders for the Debtor to comply with his obligations to participate in the discovery process. Still, the Court stopped short of granting default judgment in UMB Bank's favor as a sanction. Instead, the Debtor was barred from presenting evidence in his defense, leaving UMB Bank to prove its entitlement to a judgment in its favor.

Court to determine then is whether UMB Bank has established that controlling law supports a result in its favor. *Id.*

UMB Bank asks the Court to enter summary judgment on five of the six counts in its complaint. Specifically, UMB Bank seeks denial of the Debtor's discharge under §§727(a)(2)(A) (concealment or transfer of property), 727(a)(3) (concealed or falsified documents regarding financial condition or business transactions), and 727(a)(4)(A) (false oath). 11 U.S.C. §§727(a)(2)(A), (3), and (4)(A). Alternatively, UMB Bank seeks a determination that the debt owed to it by the Debtor should be excepted from the Debtor's discharge pursuant to §523(a)(2)(A) (incurred through fraud) and (B) (in writing, respecting financial condition). Because the Debtor will be denied his discharge, the exceptions to discharge counts will not be reached.

## B. 11 U.S.C. § 727

Denial of discharge is an extreme penalty and §727 must therefore be strictly construed against the objector and liberally construed in favor of the Debtor. *In re Cole*, 378 B.R. 215, 221 (Bankr. N.D. Ill. 2007) (citations omitted). And "[c]ourts must exercise even greater caution when considering denial of discharge sought by motion for summary judgment." *In re Antoniou*, 515 B.R. 9, 16 (Bankr. E.D.N.Y. 2014). A discharge in bankruptcy, however, is not a right but a privilege reserved only for the "honest but unfortunate debtor." *Cohen v. DeLaCruz,* 523 U.S. 213, 217 (1998) (quoting *Grogan v. Garner*, 498 U.S. 279, 287 (1991)).

*i. Section 727(a)(2)(A)*

Section 727(a)(2)(A) provides that a discharge will be denied if the "debtor, with intent to hinder, delay, or defraud a creditor . . . has transferred, removed, destroyed, mutilated, or concealed . . . property of the debtor, within one year before the date of the filing of the petition." 11 U.S.C. §727(a)(2)(A). UMB Bank must prove that that the Debtor transferred or concealed property with an improper intent within one year before the bankruptcy was filed. *In re Kontrick*, 295 F.3d 724, 736 (7th Cir. 2002).

UMB Bank's argument for denying the Debtor's discharge under §727(a)(2)(A) focuses on unauthorized sales of grain between November 2017 and May 2018, as well as the transfer of property to a self-settled trust in May 2018. There is no question that the Debtor sold or transferred grain without disclosing the sales to UMB Bank and, in fact, represented to UMB Bank that no sales had occurred despite the parties' agreement that the Debtor would so disclose and make the proceeds available to UMB Bank. There is also no question that the Debtor transferred the Grain Complex property to the self-settled Murphy Family Trust on the eve of a receiver being appointed in the state court and then recorded the quitclaim deed after the receiver had been appointed. All of these transactions occurred within one year before the bankruptcy petition was filed. The only question is whether the Debtor intended to hinder, delay, or defraud his creditors.

Direct evidence of fraud is rare. Thus, courts consider the following factors as circumstantial evidence of improper intent:

> (1) The lack or inadequacy of consideration; (2) the family, friendship, or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the general chronology of the events and transactions under inquiry.

*Vill. of San Jose v. McWilliams*, 284 F.3d 785, 791 (7th Cir. 2002 (quoting *Pavy v. Chastant (In re Chastant)*, 873 F.2d 89, 91 (5th Cir. 1989)). When a number of these factors are established, a presumption of fraudulent intent arises. *Id.*

Many of the relevant factors were unquestionably established in the Motion for Summary Judgment. The Debtor and his parents engaged in a course of conduct that consisted largely of agreeing to things that they had either no intention or no prospect of complying with, if for no other reason than to buy themselves time. For example, under their security agreement with UMB Bank, the Debtor and his parents agreed to notify UMB Bank of entities to which they intended to sell grain and that the proceeds from grain sales would be made immediately available to UMB Bank in a form payable to both the Murphys and UMB Bank. The Debtor and his parents apparently did inform UMB Bank that they intended to sell grain to ADM and certain other buyers, and, in October 2017, UMB Bank sent notices of security interests to those potential purchasers. After proceeds from two jointly payable checks from ADM totaling approximately $23,000 were applied to the debt owed to UMB Bank in November 2017, however, the Debtor and his parents sold more than $430,000 in grain to Bunge, an entity not previously disclosed to UMB Bank as a potential buyer, without

UMB Bank's knowledge or consent, and deposited those funds into a separate bank account. The sales to Bunge occurred between November 13, 2017, and May 19, 2018. The Debtor and his parents made the Bunge sales while also falsely representing to UMB Bank in the March 29 Letter that they had not sold any grain since the date of UMB Bank's last collateral inspection at the end of October 2017.

When the relationship began to sour and UMB Bank sought relief in the state court, the Debtor and his parents executed a quitclaim deed transferring the Grain Complex and other property to the Murphy Family Trust, a self-settled trust with the Debtor as trustee, for nominal consideration. The transfer was made without UMB Bank's knowledge or consent, the deed was recorded after the state court granted UMB Bank's motion and appointed a receiver, and no steps were ever taken to unwind the transfers after they were made.

Although the grain funds were deposited by the Debtor's mother into an account she shared with her husband, it is simply inconceivable that the Debtor would not have been aware of nearly half a million dollars in grain sales in a few months' time. As UMB Bank points out in its Motion for Summary Judgment, the Grain Complex was located next to the Debtor's home, and each of the sales would have required trucks going onto the property to haul away the grain. Further, the Debtor, along with his father, personally handled the farm operations and personally made the representations to UMB Bank about the amount of grain held in storage and the sales that had been made, all of which turned out to be false. And while the Debtor, at the December 2018 hearing on

his motion to dismiss his bankruptcy case, attempted to downplay the transfer of the Grain Complex to the Murphy Family Trust and blame a title company for mistakenly including certain properties in the transaction, UMB Bank points out, again, that no action has been taken to reverse the transfer.

Taken together, along with the entire history of the Debtor's conduct in this proceeding and the main bankruptcy case, the Debtor's actions in concealing grain sales and transferring the Grain Complex property to the Murphy Family Trust clearly evidence an intent to hinder, delay, and defraud his creditors, including UMB Bank. In this proceeding, the Debtor blocked every effort by UMB Bank to obtain discoverable information by disregarding UMB Bank's document production requests, refusing to make himself available to be deposed, and ignoring his obligations under the Federal Rules of Civil Procedure and this Court's pretrial and discovery orders.

The cumulative effect of the Debtor's behavior following the extensions of the loans by UMB Bank, in his bankruptcy case, and in this proceeding, was to hinder and delay his creditors and, in particular, UMB Bank. As part of that effort, the Debtor actively concealed the sale of grain, despite agreeing to disclose such sales and make the proceeds available to UMB Bank, and transferred UMB Bank's collateral to a self-settled trust when faced with the all-but-certain appointment of a state court receiver. Under the circumstances, UMB Bank's motion for summary judgment must be granted as to its count under §727(a)(2)(A). The Debtor's discharge will be denied.

### ii. Section 727(a)(4)(A)

Section 727(a)(4)(A) bars a debtor from receiving a discharge if he knowingly and fraudulently makes a false oath in connection with his bankruptcy case. 11 U.S.C. §727(a)(4)(A). "The purpose of §727(a)(4) is to ensure that the debtor provides dependable information to those who are interested in the administration of the bankruptcy estate." *Clean Cut Tree Serv., Inc. v. Costello (In re Costello)*, 299 B.R. 882, 899 (Bankr. N.D. Ill. 2003) (citation omitted). A plaintiff seeking to deny a debtor's discharge under §727(a)(4)(A) "must prove by a preponderance of evidence that: (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case." *Stamat v. Neary*, 635 F.3d 974, 978 (7th Cir. 2011). A debtor's fraudulent intent can be established by showing either intentional misrepresentations or a reckless disregard for the truth. *Id.* at 982. Statements made by a debtor on the bankruptcy petition, schedules of assets and liabilities, or SOFA are all considered to be under oath for the purposes of §727(a)(4)(A). *John Deere Co. v. Broholm (In re Broholm)*, 310 B.R. 864, 880 (Bankr. N.D. Ill. 2004). A fact is material if it relates to the debtor's financial dealings or the existence and disposition of the debtor's property. *Stamat*, 635 F.3d at 982.

Here, UMB Bank asserts that, by listing the Grain Complex on his bankruptcy schedules at a value of $2,650,000, the Debtor made a false oath. Without question, the Debtor's representation of the value of the Grain Complex was a

statement made under oath. It is also material. The Debtor scheduled more than $11 million in debt, most of which is owed to UMB Bank and secured by various property. A significant portion of the value of UMB Bank's collateral came from the Grain Complex that was purported to be worth more than $2.65 million.

As to the truth or falsity of the statement, the Court is mindful of the fact "that real estate valuation is as much art as science, and that measurements of intrinsic value more often involve a range of reasonable values rather than a single point estimate." *Robinson v. Worley*, 849 F.3d 577, 585 (4th Cir. 2017). But some valuation models and estimates, depending on the particulars of a given case, fall outside the realm of what is reasonable. *Id.* Here, the Debtor's valuation of the Grain Complex on his schedules stretched beyond that threshold; it was false and he knew it.

Valley View gave the Debtor and his parents the True Bid for the construction of the Grain Complex in the amount of $986,837. Thereafter, a second bid in the amount of $2,639,500—the Inflated Bid—was given by the Murphys to the appraiser for use in appraising the property as part of the UMB Bank loan transactions. Valley View denies making the Inflated Bid but does say that it gave the first, lower True Bid to the Murphys in WORD format. The Debtor, at his creditors meeting, admitted that the second bid was purposefully inflated and that he knew it. Although he seemed to accuse Valley View of creating the false Inflated Bid, it is more likely that the Debtor and his parents modified the True Bid. Any suggestion that Valley View manipulated the bids without the Murphys' knowledge but to their unwitting benefit is wholly incredible; absent

involvement by the Murphys there would have been no reason to create the Inflated Bid. And even if Valley View had some involvement in creating the Inflated Bid, the only inference that can logically be drawn is that the Debtor, along with his parents, participated in a manipulation of the True Bid for purposes of inflating the appraised value of the Grain Complex. Ultimately, it was the Debtor who supplied that Inflated Bid, which was more than two and a half times the True Bid, to Briggs Appraisal Associates to boost the appraised value of the property for purposes of the UMB Bank loans. Because the Debtor knowingly provided the Inflated Bid for completion of the appraisal on the property, it follows then that the Debtor knew the valuation on his schedules, which was based on that appraisal, was false.

Fraudulent intent "may be inferred from circumstantial evidence or by inferences based on a course of conduct." *In re Cole*, 378 B.R. 215, 222 (Bankr. N.D. Ill. 2007) (citing *In re Yonikus*, 974 F.2d 901, 905 (7th Cir. 1992)). "A debtor acts with the requisite intent to deceive when his statement 'is incompatible with his own knowledge.'" *Worley*, 849 F.3d at 585 (quoting *Saslow v. Michael (In re Michael)*, 452 B.R. 908, 919 (Bankr. M.D.N.C. 2011)). This not a situation where there is a mere difference of opinion as to the value of the Grain Complex. The property was appraised using a cost approach, and the Debtor provided the false Inflated Bid as a representation of that cost, knowing that it was dramatically inflated. He then used the appraisal, based on the Inflated Bid that he provided, to obtain financing and subsequently to justify the value he ascribed to the Grain

Complex on his bankruptcy schedules. The fact that the valuation is based on an actual appraisal done by a third party does not insulate the Debtor here.

The Court concludes that the Debtor acted with the requisite fraudulent intent in scheduling the Grain Complex at an inflated value. Why he did it is not consequential. But what is evident is that the Debtor has been less than candid throughout his dealings with creditors and the Trustee in his bankruptcy case, as well as in this proceeding. He knew that the value he assigned the Grain Complex was based on the Inflated Bid and scheduled it at the inflated value anyway. Had he chosen to follow the mandates of the Code and Rules and this Court's orders to participate in the discovery process in this proceeding, then perhaps he could have shed more light on his reasoning or provided a different explanation, if one existed. But he did not, and this Court must infer that he acted with fraudulent intent in knowingly placing a highly-inflated, significantly-incorrect value on the Grain Complex on his schedules. Thus, denial of the Debtor's discharge is also warranted under §727(a)(4)(A).

### i.     Section 727(a)(3)

UMB Bank also seeks to have the Debtor's discharge denied under §727(a)(3). Section 727(a)(3) provides for the denial of a debtor's discharge if "the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such failure to act was justified under all of the

circumstances of the case[.]" 11 U.S.C. §727(a)(3). Here, UMB Bank points to the False 2014 Tax Return, the 2015 and 2016 Balance Sheets that represent the value of the Grain Complex to be $2,650,000, and the March 29 Letter that states that no grain inventory had been sold between October 31, 2017, and March 29, 2018, arguing that each of the documents were ones from which the Debtor's financial condition or business transactions might be ascertained and that they were falsified without justification.

First, each of these documents contains false information. The False 2014 Tax Return submitted to UMB Bank vastly overstated the Debtor's gross income as compared to the Actual 2014 Tax Return filed with the IRS. The 2015 and 2016 Balance Sheets produced by the Debtor and given to UMB Bank unequivocally overstate the value of the Debtor's Grain Complex. And the March 29 Letter that the Debtor and his father signed and gave to UMB Bank falsely states that no grain was sold after UMB Bank's collateral inspection in October 2017. Second, they are all documents from which one might ascertain information about the Debtor's financial condition or business transactions. Indeed, they were all given to UMB Bank for the presumed purpose of helping UMB Bank ascertain such information. Third, there is no justification for falsifying the documents in the manner they were. All of the documents were manipulated in a way that inflated the Debtor's income or assets, leaving the only inference to be drawn that it was done intentionally to gain advantage in the Debtor's business relationship with UMB Bank. Because the Debtor failed to participate in discovery in any meaningful way, he never offered an explanation

or justification for the falsified documents. Under the plain language of §727(a)(3), because the Debtor falsified documents from which his financial condition or business transactions might be ascertained, without justification, denial of his discharge is warranted.

The plain language of the statute notwithstanding, some courts have interpreted §727(a)(3) as requiring some connection with the bankruptcy case. *See Miller v. LaMantia (In re LaMantia)*, 2019 WL 5388056, at *7 (Bankr. D. Me. Oct. 18, 2019) (citing *Itria Ventures LLC v. Chadha (In re Chadha)*, 598 B.R. 710, 719 (Bankr. E.D.N.Y. 2019) (holding §727(a)(3) inapplicable where complaint did not allege the debtor failed to keep or preserve recorded information such that financial circumstances could not be ascertained postpetition, but instead that the debtor misrepresented the financial health of his business prepetition); *Peoples Thrift Savs. Bank v. Larrieu (In re Larrieu)*, 230 B.R. 256, 269 (Bankr. E.D. Pa. 1999) (prepetition submission of false financial statements and tax returns might relate to the dischargeability of debt but did not amount to a claim under §727(a)(3) because it was not in connection with bankruptcy case). *LaMantia*, and the cases upon which it relies, however, cite no independent authority for reading "in connection with the bankruptcy case" or similar language into §727(a)(3). There may be some appeal to the reasoning that the prepetition dealings with a particular creditor are better addressed through a complaint to determine the dischargeability of a particular debt under §523. But that is not necessarily true. And, again, under the plain language of §727(a)(3), the Debtor may be denied his discharge for falsifying documents from which his

financial circumstances or dealings could be ascertained.  His discharge will be so denied.

### IV.   Conclusion

The Debtor's discharge will be denied. In the year preceding bankruptcy, he transferred and concealed the transfer of property with the intent to delay, hinder, and defraud his creditors, including UMB Bank. He falsified documents that he provided to UMB Bank and made a false oath on his bankruptcy papers. The result, while unfortunate, is not surprising.

Throughout his bankruptcy case, as well as in this proceeding, the Debtor has been evasive and uncooperative, to the point of openly disregarding his obligations under the Bankruptcy Code and Rules and the orders of this Court. His discharge is properly denied.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Order.

###